UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| **HEATHER VARGAS,** | § | |
| **Plaintiff** | § | |
| | § | |
| **VS.** | § | **A CIVIL ACTION 1:20-CV-00927** |
| | § | |
| **WILLIAMSON COUNTY, TEXAS,** | § | |
| **Defendant** | § | **A JURY IS DEMANDED** |

---

## PLAINTIFF'S ORIGINAL COMPLAINT

**TO THE HONORABLE UNITED STATES DISTRICT JUDGE:**

 **COMES NOW, HEATHER VARGAS**, Plaintiff herein, complaining of **WILLIAMSON COUNTY, TEXAS**, Defendant herein, and in support would show the Court as follows:

### I.  NATURE OF THE CASE

1.  This is an action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq.,* for unlawful discrimination because of sex and for retaliation.

2.  Plaintiff **HEATHER VARGAS** ("Plaintiff," or "Vargas"), formerly employed by the Williamson County Sheriff's Office ("WCSO"), alleges that WCSO discriminated against her because of sex. Specifically, WCSO forced Vargas to work in a hostile work environment, then suspended and terminated Vargas – for a pretextual reason – an alleged violation of WCSO's social media policy, when WCSO has a long history of tolerating just as serious and far more severe social media posts by its male officers. Alternatively, Vargas alleged she was suspended and terminated in retaliation for engaging in the protected activity of complaining about discrimination

and participating in a discrimination investigation.

## II.     JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331, because this action is based on Title VII, 42 U.S.C. §2000e, *et seq.*, a federal statute, and other federal statutes presenting a federal question. This Court also has jurisdiction pursuant to 28 U.S.C. §1337, because the action is based on a federal statute regulating commerce. Finally, this Court has jurisdiction over Plaintiff's pendent state law claims arising out of the same conduct.

4.      Venue is proper in the Western District of Texas, Austin Division, pursuant to 28 U.S.C. §§1391(b)(2), because a substantial part of the events or omissions (Defendant's unlawful employment practices)  giving rise to Plaintiff's claims occurred in Georgetown, Williamson County, Texas,  located within the territory of the Austin Division.

## III.     PARTIES

5.      Plaintiff **HEATHER VARGAS** is an individual residing in Bell County, Texas.

6.      Defendant **WILLIAMSON COUNTY, TEXAS** is a local government entity organized under the State of Texas, which may be served with process, by serving its County Judge, Bill Gravell, Jr., at 710 S. Main Street, Suite 101, Georgetown, Texas 78626. Williamson County, Texas, has previously represented to federal courts in the Austin Division that the Williamson County Sheriff's Office is not an entity capable of being sued, but instead, that it is an agency or department of the governmental entity, Williamson County, Texas. See *Darby v. Pasadena Police Dept.*, 939 F2d 311, 313-314 (5th Cir. 1991).

## IV.     FACTS

### A) Sexual Harassment / Sex Discrimination:

7.      Vargas has faithfully served the public in law enforcement since 2005. After a successful

stint with the Bexar County Sheriff's Office, Vargas joined the Williamson County Sheriff's Office ("WCSO") in 2012, where she served the citizens of Williamson County faithfully until she was unlawfully terminated in September of 2019. Vargas served as an undercover Narcotics Detective with the WCSO from 2014 until the time of her termination in September of 2019. During her fourteen (14) years in law enforcement, including her seven (7) years with WCSO, prior to WCSO's unlawful actions Vargas had never received disciplinary action of any kind (no verbal warnings, no write ups – nothing). Moreover, Vargas received only favorable comments on her performance during all of these years.

8.       After about four years in undercover narcotics (in approximately July of 2018), Vargas was approached by WCSO administration, including Sheriff Robert Chody, and asked if she wanted to appear on a television show called "Live PD Women on Patrol." Vargas immediately said no, because she was concerned for her safety, given that she worked undercover and a television show appearance exposing her identity threatened her undercover work and her safety. Commander Steve Deaton told Vargas that he had "bought dope in uniform" before, and "criminals don't watch this show anyway." Therefore (according to Deaton), Vargas did not need to worry about it. Vargas's Sergeant (Glen Breder) and her Lieutenant (Russell Travis) were also against Vargas' appearing on the TV show out of concern for Vargas' safety.

9.       Later that month, Vargas was pulled into an office with four male supervisors (Sgt. Breder, Lt. Travis, Commander Brinkman and Chief Fikac). Commander Brinkman ordered Vargas (in front of the other supervisors), "You do not have a choice – you will do the show." That same month, a co-worker informed Vargas someone in administration had been overheard saying it was because Vargas "looked good and [her] looks would get good ratings for the agency." Upon information and belief, no men at WCSO were ever forced to do a television show because they

"looked good and their looks would get good ratings for the agency." WCSO officials also apparently took a liking to one of the TV show's employees and discussed the fact that she was "hot." On one occasion, Commander Deaton made the statement in front of at least twenty (20) officers: "I want someone to f*ck the Live PD camera chick before she leaves." Someone filed an official complaint against Commander Deaton, but Sheriff Chody defended Deaton's statement.

10.     Having to be filmed and shown repeatedly on television performing her job as a law enforcement officer, while simultaneously continuing to work in dangerous, potential life-threatening undercover narcotics situations caused Vargas extreme stress over the next year. Vargas complained to her unit, to her chain of command, and to her mother. Many other law enforcement officers throughout WCSO expressed their concern for Vargas' safety and could not understand why WCSO would make Vargas appear on a show that put her safety at risk. It was obvious to Vargas that WCSO administration had no concern whatsoever about her safety – they were only concerned with her "looks" bringing good ratings for the TV show, and how they hoped that would reflect on WCSO. Even though Vargas did not want to be on the TV show at all, she was forced to film for approximately three (3) months from August to October of 2018. Even after WCSO's contract for the show expired, Vargas and others continued to see her episodes of the show on TV at least as late as June 5, 2020.

**B) WCSO's Long History of Overlooking Social Media Conduct by Male Officers, including Commanders:**

11.     Over the previous few years leading up to 2018-19, WCSO's Commander Deaton had made numerous inappropriate posts on his Facebook page, which contained photos of dolls depicting actions such as rape, kidnapping, sexual acts and the mutilation of a black football player (apparently for having kneeled during the National Anthem). Several of Deaton's Facebook posts went public in or around January of 2019.

12.    In one such post, Commander Deaton depicted the "Elf on the Shelf" character standing over a Barbie or similar doll, holding her hair, with the following caption:

"Sticking to etiquette our elf holds the hair of his date to the party while she pukes. Silently though he wonders whether the roofie he slipped her earlier will still be effective." (See Exhibit A).

It should also be noted that, if Plaintiff's color copy is consistent with the color image of Deaton's original post, the elf appears to be in "blackface," and whatever dark-colored liquid is depicted around the "gagging" white Barbie's mouth appears to be same color as the elf's "blackfaced" skin. *See* Exhibit A.

13.    In another post, Commander Deaton depicted the "Elf on the Shelf" character sitting or crouched next to an apparently dead or at least weakened female doll. Deaton's post depicted the female doll as having previously written on the wall in chalk "Help Me," "RIP," and tally marks which appeared to count the number of days the woman had spent in captivity before dying. Commander Deaton's post contained the following caption:

"On his latest trip back to his vacation home in Aruba, our Elf notices that Natalee's mental health is now deteriorating quickly. He must admit though that Holloway lasted longer than some of his previous 'guests.'" (See Exhibit B).

14.    In yet another Facebook post, [INSERT] Deaton depicted a black football player bleeding all over the ground because his legs had been beaten or cut off by the white "Elf on the Shelf." Deaton captioned the post:

"Our patriotic elf grew angrier all season. He finally snapped and decided to show the NFL how he goes about taking knees for not standing during our national anthem." (See Exhibit C).

15.    After these public posts went "viral," there was outrage not only that Commander Deaton had posted them at all, but also that Sheriff Chody had personally "liked" at least one of them (the photo of the black football player's legs being beaten off and severed). After this incident, Sheriff

Chody claimed he had "visited" with Deaton, but upon information and belief Commander Deaton received no actual disciplinary action from Sheriff Chody. Once again, Sheriff Chody even publicly defended Commander Deaton's posts as allegedly protected by Deaton's First Amendment rights.

**C) August / September 2019 Sex Discrimination / Retaliation Against Vargas:**

16.    After Commander Deaton's egregious posts, WCSO claimed it was adopting a new social media policy, which went into effect August 12, 2019. Immediately, Vargas ensured that her personal/private Facebook page (on which she used the anonymous name "Heather Marie" to protect her undercover identify) complied with WCSO's new policy. Vargas placed a disclaimer on her Facebook page that her views and posts did not reflect those of her employer. Vargas did not disclose on her page where she worked or that WCSO was her employer. If Vargas posted a picture in uniform on her Facebook page, she made sure her patches and last name were blurred out so that WCSO could not be identified.

17.    On August 18, 2019, a Twitter account called "Altwilcopio" (with which Vargas had no connection) posted duplicated pictures of "selfies" from Vargas's personal Facebook page. The "Altwilcopio" tweets also revealed inappropriate sexual comments WCSO Sergeant Jason Brantley (one of Vargas' co-workers, a/k/a "Jay Bam") had made on several of Vargas' posted pictures, such as:

- "I luv you [with happy face]"
- "So pretty for a girl [laughing face]"
- "Put them things up before ya hurt someone [commenting on Vargas' breasts]"
- "Cover them girls up [again commenting on Vargas' breasts];" and "How many times you heard that?" and
- "Thank you soooooooooooooooo much."

18.    While Vargas had interacted on Facebook with Sergeant Brantley's posts, she only did so

because it was her best way of responding to the awkward situation Brantley created. At that time, nothing had ever come of Commander Deaton's misogynistic posts, so when Sergeant Brantley made his sexual innuendo comments Vargas believed she had no protection regarding them from WCSO. Plus, Sergeant Bradley outranked Vargas and had been making comments like this on her social media for years apparently with impunity. It was obvious Sergeant Bradley had the blessing of WCSO's administration, so Vargas had played Brantley's comments off as best she could.

19.     About half of the comments responding to the "Altwilcopio" tweet expressed disgust at Brantley's sexual comments objectifying Vargas, while the other half "slut-shamed" Vargas, saying she had "asked for it." These tweeted pictures and screenshot posts on the "Altwilcopio" Twitter account (with which Vargas had no affiliation and over which she had no control) showed Vargas' real name, her face, and they identified her as a law enforcement officer (something Vargas would never have allowed).

20.     When the "Altwilcopio" tweets occurred, Vargas once again became extremely concerned for her safety, because at that time she was actively assigned as a case agent on an FBI gang unit task force. Vargas was in the process of procuring a wiretap on a very influential cartel group. A co-worker notified Vargas about the Twitter posts from the "Altwilcopio" Twitter account. The co-worker stated they had already made phone calls to try and have the tweets taken down – due to concern for Vargas' safety. Hours later, the Twitter account did take the post down and published a statement that its original post had never been intended to be about Vargas – instead, the "Altwilcopio" account holder stated its original post's point had been to expose the misogynistic behavior and culture Sheriff Chody and Commander Deaton had created and fostered within WCSO. That same day, Vargas deactivated her Facebook account.

21.     On August 20, 2019, Vargas reactivated her Facebook account in the evening – this time

re-designating 30-40 of her co-workers on a restricted list, meaning they would not be able to see all of Vargas' posts and would only be able to see any posts Vargas chose to make "public."

22.      On August 21, 2019, before Vargas left her house for work, she copied and posted a meme that humorously referred to herself in a self-deprecating way as a cougar ("b*tches be 37 stressing over some n*gga born in 1999"). Referring to herself, Vargas posted the caption: "It's me…I'm b*tches." (See Exhibit D). Vargas had not created this meme. Rather, it has been sent to her by an ex-boyfriend, who also had not created it. At approximately 3:00 p.m. that same day, Vargas was called into WCSO's Chief Ryle's office with her sergeant (Sgt. Breder), where Chief Ryle showed Vargas a printed screenshot of the post. Chief Ryle asked if Vargas had posted it, and she acknowledged she had. Chief Ryle then ordered Vargas to "delete it now." Chief Ryle watched Vargas delete the post and informed her to go to Internal Affairs, where Vargas was informed she was suspended for an alleged violation of WCSO's new Social Media Policy.

23.      Vargas asked the IA detective why she was being suspended and attempted to ascertain what parts of the policy she had allegedly violated, but the IA detective stated he did not know why Vargas was being suspended – he was just told to do it. This was the first post Vargas had made after the "Altwilcopio" Twitter tweets had exposed Sergeant Brantley's comments about Vargas' breasts and other lascivious remarks on her previous posts, called Brantley out for sexually harassing her and WCSO for tolerating it, and accused WCSO of fostering and feeding a misogynistic and sexually harassing culture. The meme Vargas posted was completely consistent with both the work culture of WCSO and her personal lifestyle, and it was no different than hundreds of other memes Vargas and numerous other WCSO law enforcement officers had previously posted or re-posted on social media over the previous few years. Vargas had also observed male co-workers able to post and/or speak in the workplace with this same language

without ever experiencing any disciplinary action. As detailed more fully below, Vargas was eventually fired – supposedly for this post.

24.     Vargas would show the Court that Sergeant Brantley is part of the "good ol' boy" network in WCSO. The "Altwilcopio" tweets exposed the misogynistic underpinnings of that culture. Vargas will show her suspension and eventual termination were partly in retaliation for the "Altwilcopio" Twitter posts alleging Sergeant Brantley had sexually harassed Vargas and exposing WCSO's misogynistic culture (even though Vargas had nothing to do with the "Altwilcopio" Twitter posts). Based on its interviews of Vargas, it appears that WCSO administration believed Vargas knew who was behind the "Altwilcopio" Twitter account. However, Vargas did not.

25.     Vargas will show her suspension and ultimate termination were also partially because she is a woman. Male employees at WCSO for years have posted memes containing cuss words, sexually explicit or suggestive material, violence toward women and blacks, some using cuss words and racially derogatory remarks after the so-called "new" Social Media Policy went into effect. None of those male employees were disciplined, and they were certainly not terminated. Specifically, about a month later Vargas learned that Lt. Luera (a male) – also part of WCSO's "good ol' boy" network – posted on his Williamson County Police Twitter page a post containing the same word WCSO claimed Vargas was fired for – "n*gga." Luera's post featured a license plate covered up by a hand-made sign, which read: "On God I'm OMW [on my way] to Get my Tags – please don't pull a n*gga over." At the time of Vargas' termination, this public post had already been on Lt. Luera's page since March of 2019, and Lt. Luera had never been disciplined or asked to remove it.

26.     If a man can do the same thing Vargas did and not be fired, suspended, disciplined, or even asked to take his post down, then WCSO's suspending and firing Vargas for her Facebook meme

was sex discrimination. Vargas will show the Court the real reason for her suspension and termination was because she is a woman, because WCSO has a very different attitude toward women than its attitude toward men, and because WCSO treats women differently in discipline and other employment actions than it treats men.

27.     On August 23, 2019, Vargas had a second interview with IA – this time with Vargas's lawyer, Lytza Rojas, present. Vargas explained her strong suspicion that the real reason for her suspension was that the Twitter post had "outed" Sergeant Brantley for sexual harassment and exposed WCSO's culture of treating women like sex objects. Vargas expressed her concern that, by suspending her, WCSO was treating her different from men and discriminating against her because she was a woman.

28.     On August 26, 2019, the "Altwilcopio" Twitter page re-posted Vargas's Facebook pictures and selfies – again with Sergeant Brantley's comments. This time, Vargas' face and name were blurred out. The Twitter post (which, again, Vargas had nothing to do with) still accused Sergeant Brantley of sexually harassing Vargas, and it called out WCSO for its culture tolerating the sexual harassment of women.

29.     On August 28, 2019, Vargas had a third interview with IA. Chief Ryle, her lawyer (Lytza Rojas) and WCSO's attorney, Jason Nassour, were all present. Since this interview came right after the re-emergence of the Twitter "sexual harassment" accusations, Vargas hoped that perhaps WCSO was calling her back in to finally ask whether or not Vargas was being sexually harassed. Instead, during this interview Chief Ryle only seemed obsessed with finding out the identity of whoever was behind the "Altwilcopio" Twitter account. Chief Ryle claimed it might be a "criminal act" for this Twitter page to expose the identity of an undercover detective (which, of course, was completely inconsistent with WCSO's having put Vargas on television the year before – against

her will and despite the concerns Vargas and other expressed at the time about her safety).

30.    WCSO accused Vargas of having somehow caused the original "Altwilcopio" tweets to be taken down. WCSO's officials demanded to know who Vargas had called (but she had called no one), and who she would call if she wanted the new tweets taken down. Since Vargas had no information about the "Altwilcopio" Twitter account, she had no answers for WCSO. At the end of this interview, WCSO asked if Vargas had any questions. Vargas responded by asking why WCSO officials were suddenly so concerned about her safety now, when they had forced her to film Live PD Women on Patrol for three months the year before with absolutely no concern about her safety or wellbeing then. Attorney Rojas asked why Vargas's suspension could not be lifted since this disciplinary interview was clearly not even about the post Vargas had made on August 21, 2019. WCSO responded that Vargas' suspension would not be lifted, that Vargas was getting paid and was still a detective there, and that Vargas would continue to be suspended since the situation had gotten more intense (apparently referring to the new "Altwilcopio" Twitter account re-posts exposing WCSO's culture of sexual harassment and its attitude toward women).

31.    On September 9, 2019, Vargas had her fourth interview with IA, at which Chief Ryle, IA Sergeant Lowthorp, and WCSO's attorney Jason Nassour were present. This time, Vargas's attorney Lytza Rojas was escorted out of the room and told she was not allowed to be present. In other words, even though Vargas's employer WCSO had its own attorney present, Vargas could not have her attorney present. Chief Ryle asked Vargas if she had anything she wanted to say for them to "take into consideration." Vargas said she had nothing to say, and the interview was terminated. Apparently, this interview also had nothing to do with Vargas' post.

32.    On September 11, 2019, Vargas had her fifth interview with IA, at which Chief Ryle and IA Sergeant Lowthorp were present. Vargas had been told over the phone that morning not to bring

her attorney – that her attorney would not be let into the interview. Chief Ryle slid a paper across the table to Vargas informing her that she was terminated from WCSO, allegedly for having violated WCSO's social media policy.

33.     After her termination, Vargas learned about Lt. Luera's Williamson County Police Twitter post containing the word "n*gga" – the same word for which Vargas was allegedly fired. Luera's post had been up since March 2019. The same day Vargas discovered Luera's post (September 19, 2019), a Twitter account called "Buddy Falcon" posted how unfair it was that Vargas had been terminated for using that word, while Lt. Luera had not. Lt. Luera's post was taken down immediately, but by the next day – September 20, 2019 – it was back up. Upon information and belief, Luera was never disciplined for his post.

34.     By September 25, 2019, several people were upset that Vargas had been fired but Lt. Luera had not. Upon information and belief, Sheriff Chody, when confronted with this inconsistency by WCSO, made a statement to the effect that "Luera just retweeted a post, Heather posted an original." This was a false statement, since Vargas' post was not something she had created but had merely been a re-post of someone else's meme. Further, Chody's alleged distinction is not credible, which further illustrates the pretextual nature of Vargas' termination. Vargas will show the Court that WCSO's true reason for her termination was sex discrimination, or retaliation for Vargas' having complained of prior sex discrimination / sexual harassment.

35.     In the alternative, Vargas would show the Court that her termination was in retaliation for having participated in an investigation of sexual harassment. The "Altwilcopio" tweets constituted reports of sexual harassment and sex discrimination against WCSO's female officers. Regardless of WCSO's intentions regarding the "Altwilcopio" tweets, when WCSO investigated them WCSO was investigating reports of sexual harassment and sex discrimination. When WCSO questioned

Vargas regarding the "Altwilcopio" Twitter account's reports of sexual harassment and sex discrimination, Vargas became a participant in an investigation regarding allegations of discriminatory conduct. Her participation constituted protected activity under Texas Labor Code Chapter 21 and Title VII, and retaliating against Vargas for the content of her answers violated Chapter 21 and Title VII.

36.     In short, in addition to the fact that Vargas was treated different from her male counterpart, Vargas would alternatively show the Court she was suspended and terminated for three reasons:

   a)   Because she is a woman, Vargas' Facebook post was perceived differently than the similar post by Lt. Luera – a man;

   b)   WCSO retaliated against Vargas because she had previously opposed her disparate treatment and sexual harassment in 2018 (regarding the "Live PD Women on Patrol" TV show), and because she reported and complained about sex discrimination and sexual harassment again during her August and September 2019 interviews; and

   c)   WCSO retaliated against Vargas for her participation in the complaint of sexual harassment or WCSO's investigation of it. Whether or not WCSO officials realized their investigation of the "Altwilcopio" tweets constituted an investigation of an allegation of sexual harassment by the Twitter account "Altwilcopio," it did. Vargas' participation in such investigation was protected activity. WCSO did not like the truthful answers Vargas provided during its investigation, perhaps because Vargas' answers did not help WCSO discover and intimidate the person (or persons) exposing WCSO's culture and attitudes about women and how WCSO had treated women. Still further in the alternative, WCSO very likely believed Vargas herself was behind the Twitter account, or that she was working with the person who was. Thus, WCSO suspected Vargas of having made a report of sexual harassment and sex discrimination. This also constitutes discrimination by association.

37.     Vargas is a single mother who worked loyally, faithfully, and diligently for WCSO. She was the first and only woman ever to be in the narcotics unit. Vargas performed a great many undercover operations, the most in her unit. Vargas was picked to be assigned to an FBI gang task force, and she was also Narcotics Officer of the year in 2017. Vargas was eminently qualified, and she performed at an exemplary level. Vargas had no disciplinary history. In addition to the loss of

her job, her house, her health insurance and other benefits, Vargas' career in law enforcement may potentially be destroyed as a result of WCSO's unlawful actions toward her. Although Vargas eventually found another law enforcement job several months later, she was forced to accept less pay, a much longer commute, longer hours, and she had to start over at the bottom of the career ladder. Vargas has suffered significant stress and mental anguish as a result of WCSO's unlawful termination of her employment.

## V.      EXHAUSTION OF ADMINISTRATIVE REMEDIES

38.     Vargas timely submitted a questionnaire/complaint to the Texas Workforce Commission Civil Rights Division on or about December 12, 2019, within one hundred eighty (180) days and well within three hundred (300) days of her termination, and within one hundred eighty (180) and well within three hundred (300) days after the period of continuous sexually harassing hostile work environment finally ended. In her questionnaire/complaint, Vargas indicated she was the victim of sex discrimination, as well as retaliation, and she indicated her desire to file a Charge of Discrimination, as well as her desire that her Charge be dual-filed with both the Texas Workforce Commission's Civil Rights Division (TWC/CRD) and the Equal Employment Opportunity Commission (EEOC).

39.     The Texas Workforce Commission prepared a Charge of Discrimination for Vargas to sign, and Vargas executed it promptly. The Charge therefore relates back to Vargas's initial inquiry, which Vargas at all times was entitled by law to amend and perfect. Vargas' Charge was investigated by TWC/CRD under its workshare agreement with EEOC.

40.     When Williamson County Sheriff's Department failed to resolve this matter at the administrative level, TWC issued Vargas a right to sue letter on or about July 10, 2020. Vargas timely files this lawsuit within sixty (60) days of receiving her TWC right to sue letter.

41.     The U. S. Department of Justice, Civil Rights Division also issued Vargas a right to sue letter on July 21, 2020, which was received on the same date by Vargas and her attorney. Vargas timely files this Complaint well within ninety (90) days of receiving her EEOC right to sue letter.

## VI.     CAUSES OF ACTION

### A) COUNT 1: Title VII Sex Discrimination: Termination

42.     Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs 1-41.

43.     Defendant Williamson County Sheriff's Department is an "employer" as defined under Title VII.

44.     Title VII expressly prohibits discrimination based on sex, and it makes such discrimination an unlawful employment practice. *See* Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, et seq., as amended by the Civil Rights Act of 1991 ("Title VII").

45.     WCSO discriminated against Vargas because of sex by terminating her employment on or about September 11, 2019.

46.     The reasons given for Vargas's termination were pretexts for discrimination and were not the real reason. The reason was discrimination because of sex.

47.     Plaintiff need not prove that every WCSO agent, employee or representative participating in Vargas's termination had a discriminatory motive, or that any ultimate decision maker(s) in Vargas's termination had a discriminatory motive. Rather, in the alternative, Plaintiff would show that one or more of those WCSO actors did act out of an unlawful discriminatory motive. Regardless of whether any or all of the other actors involved share this discriminatory motive, Vargas would show that any WCSO agent's, employee's, or representative's discriminatory motive is imputed to WCSO's other actors because: 1) such WCSO agents, employees, or

representatives committed acts of a discriminatory nature against Vargas; 2) such WCSO agents, employees, or representatives intended those acts would cause Vargas to suffer termination or other adverse employment action; and 3) such WCSO agents, employees, or representatives actions caused the termination or other adverse employment action, regardless of whether such WCSO agents, employees, or representatives with a discriminatory motive participated in Vargas' termination.

48.     WCSO hereby sues for sex discrimination in the form of termination under Title VII.

**B) COUNT 2: Title VII Retaliation: Termination.**

49.     Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs 1-48.

50.     Defendant William County Sheriff's Department is an "employer" as defined under Title VII.

51.     Vargas's complaint about prior disparate treatment (WCSO's having forced her to go on "Live PD" because her looks would improve WCSO's ratings), as well as her participation in WCSO's investigation of the "Altwilcopio" Twitter account's sexual harassment and sex discrimination allegations, were both protected activity under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, et seq., as amended by the Civil Rights Act of 1991 ("Title VII").

52.     Title VII expressly prohibits an employer from retaliating against an employee because she has complained of or opposed any practice made an unlawful practice by Title VII, or because she has testified, assisted or participated in any manner in an investigation, proceeding, or hearing under Title VII. 42 U.S.C. §2000e-3.

53.     The reason given for Vargas' termination was a pretext for retaliation and not the real reason. The real reason was retaliation for complaining about past discrimination and the answers

Vargas gave while participating in the "Altwilcopio" investigation.

54.     Plaintiff need not prove that every WCSO agent, employee or representative participating in the decision to terminate her had this retaliatory motive. Rather, in the alternative, Plaintiff would show that one or more of those WCSO actors did act out of an unlawful retaliatory motive. Regardless of whether any or all of the other actors involved shared this retaliatory motive, Vargas would show that any WCSO agent's, employee's, or representative's retaliatory motive is imputed to WCSO's other actors because: 1) such WCSO agents, employees, or representatives committed acts of a retaliatory nature against Vargas; 2) such WCSO agents, employees, or representatives intended those acts would cause Vargas' termination or other adverse employment action; and 3) such WCSO agents, employees, or representatives actions caused the termination or other adverse employment action, regardless of whether such WCSO agents, employees, or representatives with a retaliatory motive participated in the termination.

55.     Vargas hereby sues for retaliation in the form of termination under Title VII.

   **C) COUNT 3: Tex. Labor Code Chapter 21 Sex Discrimination: Termination.**

56.     Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs 1-55.

57.     Defendant Williamson County Sheriff's Department is an "employer" as defined under Chapter 21 of the Texas Labor Code ("Chapter 21").

58.     Chapter 21 expressly prohibits discrimination based on sex, and it makes such discrimination an unlawful employment practice. *See* Texas Labor Code §21.051.

59.     WCSO discriminated against Vargas because of sex by terminating her employment on or about September 11, 2019.

60.     The reasons given for Vargas's termination were pretexts for discrimination and were not

the real reason. The reason was discrimination because of sex.

61.     Plaintiff need not prove that every WCSO agent, employee or representative participating in Vargas's termination had a discriminatory motive, or that any ultimate decision maker(s) in Vargas's termination had a discriminatory motive. Rather, in the alternative, Plaintiff would show that one or more of those WCSO actors did act out of an unlawful discriminatory motive. Regardless of whether any or all of the other actors involved share this discriminatory motive, Vargas would show that any WCSO agent's, employee's, or representative's discriminatory motive is imputed to WCSO's other actors because: 1) such WCSO agents, employees, or representatives committed acts of a discriminatory nature against Vargas; 2) such WCSO agents, employees, or representatives intended those acts would cause Vargas to suffer termination or other adverse employment action; and 3) such WCSO agents, employees, or representatives actions caused the termination or other adverse employment action, regardless of whether such WCSO agents, employees, or representatives with a discriminatory motive participated in Vargas' termination.

62.     WCSO hereby sues for sex discrimination in the form of termination under Chapter 21.

   **D)  COUNT 4: Tex. Labor Code Chapter 21 Retaliation: Termination.**

63.     Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs 1-62.

64.     Defendant Williamson County Sheriff's Department is an "employer" as defined under Chapter 21 of the Texas Labor Code ("Chapter 21").

65.     Vargas's complaint about prior disparate treatment (WCSO's having forced her to go on "Live PD" because her looks would improve WCSO's ratings), as well as her participation in WCSO's investigation of the "Altwilcopio" Twitter account's sexual harassment and sex

discrimination allegations, were both protected activity under Texas Labor Code Chapter 21.

66.     Chapter 21 expressly prohibits an employer from retaliating against an employee because she has complained of or opposed any practice made an unlawful practice by Chapter 21, or because she has testified, assisted or participated in any manner in an investigation, proceeding, or hearing under Chapter 21.

67.     The reason given for Vargas' termination was a pretext for retaliation and not the real reason. The real reason was retaliation for complaining about past discrimination and the answers Vargas gave while participating in the "Altwilcopio" investigation.

68.     Plaintiff need not prove that every WCSO agent, employee or representative participating in the decision to terminate her had this retaliatory motive. Rather, in the alternative, Plaintiff would show that one or more of those WCSO actors did act out of an unlawful retaliatory motive. Regardless of whether any or all of the other actors involved shared this retaliatory motive, Vargas would show that any WCSO agent's, employee's, or representative's retaliatory motive is imputed to WCSO's other actors because: 1) such WCSO agents, employees, or representatives committed acts of a retaliatory nature against Vargas; 2) such WCSO agents, employees, or representatives intended those acts would cause Vargas' termination or other adverse employment action; and 3) such WCSO agents, employees, or representatives actions caused the termination or other adverse employment action, regardless of whether such WCSO agents, employees, or representatives with a retaliatory motive participated in the termination.

69.     Vargas hereby sues for retaliation in the form of termination under Chapter 21.

**E)     Count 5: Sex Discrimination: Sexual Harassment, Hostile Work Environment**

70.     Under **Texas Labor Code §21.051**, an employer commits an unlawful employment practice if because of sex, the employer:

(1) fails or refuses to hire an individual, discharges an individual, or discriminates in any other manner against an individual in connection with compensation or the terms, conditions, or privileges of employment; or

(2) limits, segregates, or classifies an employee or applicant for employment in a manner that would deprive or tend to deprive an individual of any employment opportunity or adversely affect in any other manner the status of an employee.

71.     Sex discrimination includes subjecting employees to a severe or pervasive sexually harassing hostile work environment. Here, from at least July of 2018 until her termination in September of 2019, Vargas was subjected to sexual harassment in the form of a hostile work environment. Examples of Vargas' hostile work environment included WCSO's forcing Vargas to appear on "Live PD" (jeopardizing her safety) solely because her looks would improve WCSO's ratings. It also included lewd comments generally in the presence of the work force that were demeaning to women, as well as lewd comments by supervisors on Vargas' Facebook page about Vargas' physical appearance and body image.

72.     Vargas hereby sues for sex discrimination based on a hostile work environment.

## VII.     PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Heather Vargas respectfully requests the following relief:

a.   Grant a permanent injunction enjoining Defendant, its officers, successors, assigns and all persons in active concert or participation with Defendant, from retaliations against other employees who file complaints based on sex (gender), who oppose such discriminatory practices, or who participate in or provide information in investigations of such complaints;

b.   Order Defendant to institute and carry out policies, practices, and programs which provide equal employment opportunities for all employees regardless of sex (gender), and which eradicate the effects of its past unlawful employment practices;

c.   Order Defendant to make Vargas whole by reinstating her to her former position, with all seniority, salary, benefits, retirement eligibility and any other employee statuses completely restored;

d.   Order Defendant to make Vargas whole by providing compensation for

past and future pecuniary and economic losses resulting from Defendant's unlawful practices described above, including but not limited to back pay, front pay, health and other fringe benefits and pecuniary harm resulting from the loss of such benefits, as well as the pecuniary harm to Vargas's retirement contributions, vesting, draw schedule, or any other pecuniary loss;

e.  Order Defendant to make Vargas whole by providing compensation for non-pecuniary losses resulting from the unlawful practices described above, including but not limited to emotional pain, suffering, inconvenience, loss of enjoyment of life, humiliation, loss of self-esteem, loss of civil rights and nominal damages, in an amount to be determined at trial;

f.  Order Defendant to pay Vargas punitive damages for its malicious and reckless conduct described above, in an amount to be determined at trial;

g.  Order Defendant to pay Vargas's litigation costs and expenses, including reasonable attorneys' fees, expert witness fees, and pre-judgment and post-judgment interest; and

h.  Grant such further relief as the Court deems necessary and proper in the public interest.

## DEMAND FOR JURY

Plaintiff demands trial by jury of all issues of fact raised by this Complaint.

Respectfully submitted,

Walter L. Taylor
State Bar No. 19727030
**HART LAW FIRM, PLLC**
*Wtaylor@thehartlawfirm.com*
6630 Colleyville Blvd, Suite 100
Colleyville, Texas 76034
Tel: (817) 329-7020
Fax: (682) 292-7406

**ATTORNEY FOR HEATHER VARGAS**